**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| GLEN ROSENBAUM, derivatively on behalf of CENTENE CORPORATION,<br><br>*Plaintiff*,<br><br>v.<br><br>SARAH M. LONDON, ANDREW LYNN ASHER, FREDERICK H. EPPINGER, JESSICA L. BLUME, KENNETH A. BURDICK, CHRISTOPHER J. COUGHLIN, H. JAMES DALLAS, WAYNE S. DEVEYDT, MONTE E. FORD, THOMAS R. GRECO, LORI J. ROBINSON, THEODORE R. SAMUELS, and KENNETH Y. TANJI,<br><br>*Defendants*,<br><br>*– and –*<br><br>CENTENE CORPORATION,<br><br>*Nominal Defendant*. | C.A. No. |

**<u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>**

By and through his undersigned counsel, Plaintiff Glen Rosenbaum ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant Centene Corporation ("Centene" or the "Company") and against certain current and former officers and directors of the Company for violations of section 14(a) of the Exchange Act, contribution under section 10(b) of the Exchange Act, Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act, breaches of fiduciary duties, unjust enrichment, abuse of control, gross

mismanagement, and waste of corporate assets. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Centene and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on Centene's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related securities fraud class action lawsuit captioned *Lunstrum v. Centene Corporation, et al., Case No. 25-cv-05659 (S.D.N.Y.)* (the "Related Securities Action"); and (e) review of other publicly available information concerning Centene and the Defendants.

**NATURE OF THE ACTION**

1. Plaintiff brings this action derivatively for the benefit of Nominal Defendant Centene against certain of the Company's current and former executive officers and directors aiming to rectify the Defendants' breaches of fiduciary duties for issuing false and misleading statements and/or omitting material information in the Company's public filings and proxy statements from approximately December 12, 2024 to the present (the "Relevant Period").[1]

2. Centene is a healthcare company the provides programs and services to uninsured and underinsured families, as well as commercial organizations within the United States. The

[1] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from approximately December 12, 2024 to June 30, 2025; however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

Company provides its services through primary and specialty care physicians, hospitals, behavioral health practitioners, and ancillary providers.

3. In public statements made to investors throughout the Relevant Period, the Company made representations about its expected revenue guidance and adjusted diluted EPS for fiscal year ("FY") 2025. Defendants expressed confidence in the Company's rates of enrollment and morbidity, as well as its retention rates for Centene's Medicare segment.

4. Defendants' public representations about the Company's business and expected financial performance were contradicted by materially adverse facts as to the actual state of Centene's business prospects and financial condition. Particularly, Defendants' representations regarding the Company's enrollment and morbidity rates were materially false and misleading.

5. On July 1, 2025, the Company published a press release retracting its 2025 financial guidance, lowering its revenue projection and its adjusted EPS to $1.8 billion and $2.75 billion, respectively. This decision followed a detailed review of the 2025 Health Insurance Marketplace, which revealed that the Company's overall market growth across 22 states, representing 72% of its marketplace membership, was below expectations.

6. Investors reacted poorly to this news, and Centene's stock price fell by $22.87—or 40.4%—to close at $33.87 per share on July 2, 2025, down from $56.65 per share.

## **JURISDICTION AND VENUE**

7. This Court has jurisdiction over this action pursuant to the subject matter of this action pursuant to 28 U.S.C. § 1331 because the claims arise under and pursuant to §10(b) of the Exchange Act and Rule 10(b)-5 promulgated thereunder.

8. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a), as they relate to Plaintiff's claims under 15 U.S.C. §78n(a).

9. Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation within this district by doing business here and engaging in numerous activities that had an effect in this jurisdiction.

## PARTIES

### A. Plaintiff

10. Plaintiff was a shareholder during the Relevant Period, is currently, and has continuously been, a holder of Centene common stock.

### B. Nominal Defendant

11. Nominal Defendant Centene is incorporated in Delaware and its current principal executive offices are located at 7700 Forsyth Boulevard, St. Louis, Missouri, 63105. The Company's common stock trades on the New York Stock Exchange (the "NYSE") under the ticker symbol "CNC".

### C. Defendants

12. Defendant Sarah M. London ("London") serves as the Chief Executive Officer ("CEO") of Centene and is a member of the Company's Board of Directors (the "Board"). For the fiscal year of 2024, London received $20,602,148 in total compensation.[2] Defendant London is named as a defendant in the Related Securities Action.

13. Defendant Andrew Lynn Asher ("Asher") has served as the Chief Financial Officer ("CFO") since 2021. For the fiscal year of 2024, Asher received $11,182,412 in total compensation. Defendant Asher is named as a defendant in the Related Securities Action.

---

[2] Includes salary, stock awards, option awards, non-equity incentive plan compensation and all other compensation.

14. Defendants London and Asher are collectively referred to herein as the "Securities Action Defendants."

15. Defendant Frederick H. Eppinger ("Eppinger") serves as the Chairman of the Board and has been a member of the Board since 2006. Eppinger is a member of both the Compensation and Talent Committee and the Quality Committee. For the fiscal year of 2024, Eppinger received $590,026 in total compensation.

16. Defendant Jessica L. Blume ("Blume") has been a member of the Board since 2018. Blume is Chair of the Governance Committee and is a member of the Audit and Compliance Committee. For the fiscal year of 2024, Blume received $369,969 in total compensation.

17. Defendant Kenneth A. Burdick ("Burdick") has been a member of the Board since 2022. Burdick is Chair of the Quality Committee. For the fiscal year of 2024, Burdick received $423,234 in total compensation.

18. Defendant Christopher J. Coughlin ("Coughlin") has been a member of the Board since 2022. Coughlin is Chair of the Compensation and Talent Committee and a member of the Audit and Compliance Committee For the fiscal year of 2024, Coughlin received $369,969 in total compensation.

19. Defendant H. James Dallas ("Dallas") has been a member of the Board since 2020. Dallas is a member of both the Audit and Compliance Committee and the Quality Committee. For the fiscal year of 2024, Dallas received $349,969 in total compensation.

20. Defendant Wayne S. DeVeydt ("DeVeydt") served as a member of the Board during the Relevant Period until August of 2025. For the fiscal year of 2024, DeVeydt received $379,969 in total compensation.

21. Defendant Monte E. Ford ("Ford") has been a member of the Board since 2022. Ford is a member of both the Compensation and Talent Committee and the Quality Committee. For the fiscal year of 2024, Ford received $349,969 in total compensation.

22. Defendant Thomas R. Greco ("Greco") served as a member of the Board during the Relevant Period until August of 2025. For the fiscal year of 2024, Greco received $234,857 in total compensation.

23. Defendant Lori J. Robinson ("Robinson") served as a member of the Board during the Relevant Period until May of 2025. For the fiscal year of 2024, Robinson received $324,969 in total compensation.

24. Defendant Theodore R. Samuels ("Samuels") has been a member of the Board since 2022. Samuels is a member of both the Compensation and Talent Committee and the Governance Committee. For the fiscal year of 2024, Samuels received $349,969 in total compensation.

25. Defendant Kenneth Y. Tanji ("Tanji") has been a member of the Board since February 2025. Yanji is Chair of the Audit and Compliance Committee and a member of the Governance Committee.

26. Defendants London, Eppinger, Blume, Burdick, Coughlin, Dallas, Ford, Samuels, and Tanji are collectively referred to herein as the "Director Defendants."

27. The Director Defendants along with the Securities Action Defendants are referred to collectively herein as the "Individual Defendants."

28. The Individual Defendants along with Centene are known collectively as the "Defendants."

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

29. By reason of their positions as officers, directors, and/or fiduciaries of Centene, and because of their ability to control the business and corporate affairs of Centene, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Centene in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Centene and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

30. Each director and officer of the Company owes to Centene and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

31. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

**Duties of the Members of the Audit and Compliance Committee**

32. Pursuant to the Audit and Compliance Committee Charter of Centene (amended as of May 13, 2025)[3], the purpose of the Audit and Compliance Committee is as follows:

[3] Available at https://filecache.investorroom.com/mr5ir_centene/806/Audit_and_Compliance_Committee_Charter_5-13-25.pdf.

**I. Purpose**

The Audit and Compliance Committee (the "Committee") is appointed by the Board of Directors (the "Board") of Centene Corporation (the "Company") to assist the Board's oversight of: the integrity of the Company's financial statements; the qualifications and independence of the Company's independent registered public accounting firm engaged for the purpose of preparing or issuing an audit report for inclusion in the Company's Annual Report on Form 10-K (the "independent auditor"); the performance of the Company's internal audit function and independent auditor; the Company's enterprise risk management framework and the Board's process for overseeing the Company's exposure to risks; the Company's compliance with legal and regulatory requirements; the Company's ethics and compliance programs and the effectiveness of its compliance function, including compliance with its Code of Conduct; and cybersecurity, business continuity, disaster recovery and other risks related to information technology ("IT"). The Committee is also responsible for preparing an audit committee report as required by the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.

33. Concerning the Committee's general authority and responsibilities, the Audit and Compliance Committee Charter says following:

1. General. The Committee shall discharge its responsibilities and shall assess the information provided by the Company's management and the independent auditor, in accordance with its business judgment. Management is responsible for the preparation, presentation and integrity of the Company's financial statements, for the appropriateness of the accounting principles and reporting policies that are used by the Company and for establishing and maintaining adequate internal control over financial reporting. The independent auditor is responsible for auditing the Company's financial statements and the Company's internal control over financial reporting and for reviewing the Company's unaudited interim financial statements. The authority and responsibilities set forth in this Charter do not reflect or create any duty or obligation of the Committee to plan or conduct any audits, to determine or certify that the Company's financial statements are complete, accurate, fairly presented, or in accordance with generally accepted accounting principles ("GAAP") or applicable law, or to guarantee the independent auditor's reports.

34. Concerning oversight of independent auditors, the Audit and Compliance Committee Charter states the following:

2. Oversight of Independent Auditors.

* * *

g. *Oversight*. The independent auditor shall report directly to the Committee, and the Committee shall be directly responsible for oversight of the work of the independent auditor, including resolution of disagreements between Company management and the independent auditor regarding financial reporting. In connection with its oversight role, the Committee shall, from time to time as appropriate:

- Receive and consider the reports required to be made by the independent auditor regarding:

  - critical accounting policies and practices;

  - any critical audit matters arising from the current period audit;

  - alternative treatments within GAAP for policies and practices related to material items that have been discussed with Company management, including ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor; and

  - other material written communications between the independent auditor and Company management.

- Review with the independent auditor:

  - any audit problems or difficulties the independent auditor encountered in the course of the audit work and management's response, including any restrictions on the scope of the independent auditor's activities or on access to requested information and any significant disagreements with management;

  - major issues as to the adequacy of the Company's internal control over financial reporting and any special audit steps adopted in light of material control deficiencies;

  - analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements;

  - the effect of regulatory and accounting initiatives, as well as off-balance sheet transactions and structures, on the financial statements of the Company; and

- any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles.

35. Concerning financial statements and disclosures, the Audit and Compliance Committee Charter states the following:

3. Audited Financial Statements.

a. *Review and Discussion*. The Committee shall meet to review and discuss with the Company's management and independent auditor the Company's audited financial statements, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations." Additionally, the Committee shall discuss with the independent auditor the results of the annual audit and any other matters required to be communicated to the Committee under auditing standards of the PCAOB and SEC rules.

b. *Recommendation to Board Regarding Financial Statements*. The Committee shall consider whether it will recommend to the Board that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K.

c. *Audit Committee Report*. The Committee shall prepare a committee report for inclusion in the annual proxy statement of the Company.

4. Review of Other Financial Disclosures.

a. *Quarterly Financial Statements*. The Committee shall meet to review and discuss with the Company's management and independent auditor the Company's quarterly financial statements, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations." The independent auditor shall discuss promptly with the Committee and the Chief Financial Officer any matters identified in connection with the independent auditor's review of quarterly financial information which are required to be discussed by applicable auditing standards.

b. *Earnings Release and Other Financial Information*. The Committee shall discuss generally the type and presentation of information to be disclosed in the Company's earnings press releases, paying particular attention to any use of "pro forma," or "adjusted" non-GAAP, information, as well as financial information and earnings guidance provided to analysts, rating agencies and others.

36. Concerning internal controls and procedures, the Audit and Compliance Committee Charter states the following:

5. Controls and Procedures.

a. *Oversight.* The Committee shall, in conjunction with the Chief Executive Officer and Chief Financial Officer of the Company, coordinate the Board's oversight of the Company's internal control over financial reporting, disclosure controls and procedures.

b. *Oversight of Internal Audit Function.* The Committee shall assist the Board in overseeing the performance of the Company's internal audit function, including the following:

- Review the reporting relationship of the internal audit function and periodically meet separately with the Company's Chief Internal Auditor.
- Review and approve the internal audit function's plan, budget and activities for the upcoming fiscal year and evaluate the internal audit function’s responsibilities and staffing.
- Review the status of any existing or newly identified significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting on a quarterly basis.
- Review the compensation arrangements for the Chief Internal Auditor in coordination with the Compensation and Talent Committee.

c. *Hiring Policies*. The Committee shall establish policies regarding the hiring of current or former employees of the Company's independent auditor.

d. *Procedures for Complaints.* The Committee shall establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters; and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

e. *Evaluation of Financial and Internal Audit Management.* The Committee shall coordinate with the Compensation and Talent Committee the evaluation of the Company's Chief Financial Officer, Chief Accounting Officer and Chief Internal Auditor.

f. *Funding.* The Company shall provide for appropriate funding, as determined by the Committee, in its capacity as a committee of the Board, for payment of:

- compensation to any registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services; and

- ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.

6. <u>Risk Management</u>.

a. The Committee shall review the Company's enterprise risk management reporting processes designed to assist the Board in its oversight of the identification, assessment, prioritization and management of critical risks and management's risk mitigation strategies.

b. The Committee shall oversee the monitoring of risk exposures and the effectiveness of the enterprise risk management framework.

c. The Committee shall meet periodically with management to review the Company's significant financial, regulatory, reputational or other risk exposures, and the steps management has taken to identify, monitor, assess and control or avoid such exposures.

7. <u>Financial Matters</u>.

a. The Committee shall periodically review with management, and provide oversight of, the Company's capital structure and liquidity position, including its cash flows.

b. The Committee shall make recommendations to the Board regarding any changes to the Company's capital structure that the Committee determines, in its business judgment, to be necessary or advisable. This responsibility includes, without limitation, oversight of the following:

- transactions involving the Company's equity securities such as public offerings, stock repurchase programs or stock splits (but not including equity compensation plans);

- transactions involving the Company's debt securities and other material debt obligations undertaken by the Company;

- the Company's dividend policies and practices; and
- statutory capital requirements applicable to the Company's regulated subsidiaries.

c. The Committee shall oversee the Company's investment policies and strategy.

d. In connection with the Committee's risk management oversight responsibilities, the Committee shall review the Company's major insurance programs, such as directors and officers liability coverage and cyber liability coverage.

e. The Committee shall review significant financial activities, including the use of swaps and derivatives and similar risk management vehicles.

f. The Committee shall oversee the implementation and execution of the Company's corporate tax policies.

g. The Committee shall perform such other financial oversight responsibilities as the Board may request.

37. Concerning the Ethics & Compliance Program, the Audit and Compliance Committee Charter says the following:

10. <u>Ethics & Compliance Program</u>.

a. The Committee shall oversee matters related to the Company's compliance with laws and regulations, including those concerning fraud, waste and abuse and federal and state healthcare program requirements. This oversight responsibility shall include inquiries from, and audits, investigations and surveys by, federal and state regulatory and enforcement agencies and related legal and administrative proceedings.

b. The Committee shall oversee the Company's Ethics & Compliance Program (the "Program"), including the performance of the Chief Risk, Ethics & Compliance Officer, and shall review and concur in the appointment, promotion or dismissal of the Chief Risk, Ethics & Compliance Officer, who has direct reporting authority to the Board. In fulfilling this responsibility, the Committee shall consider, among other things, the relevant expectations and requirements of federal and state regulatory and enforcement agencies.

c. At least annually, the Committee shall review the design, dedicated resources and operational effectiveness of the Program. In connection

with this assessment, the Committee shall obtain and consider reports by the internal audit department as it deems appropriate. If the Committee determines that it is necessary to retain one or more external experts to assist the Committee with the evaluation, it shall do so.

d. The Committee shall oversee, and periodically review, the process that the Company has developed for identifying, assessing, prioritizing and mitigating legal, regulatory and compliance risks.

e. The Committee shall annually review, and approve, the compliance audit, testing and monitoring plan developed by management.

f. The Committee shall review periodically the effectiveness of the Company's process for screening individuals and/or entities that have been excluded, debarred, suspended from or otherwise deemed ineligible for, participation in any applicable state or federal healthcare, procurement and/or non-procurement programs.

g. The Committee shall receive periodic reports from the Chief Risk, Ethics & Compliance Officer, who has express authority to communicate directly with the Committee as necessary, and other members of management, on, among other topics:

- Management's assessment of the efficacy of the Program;

- Key Program initiatives, including the development and execution of the Company's Annual Compliance Work Plan;

- Management's annual review of the Company's Code of Conduct and compliance policies and procedures;

- The development and implementation of the Company's annual ethics and compliance training and education program;

- Reports of ethics and compliance concerns received through "open door" channels and mechanisms (such as hotlines), including potential violations of laws, regulations, administrative directives, federal and healthcare program requirements, the Code of Conduct and/or the Company's compliance policies and procedures;

- The process established for assessing, investigating and resolving reports of ethics and compliance concerns;

- Findings and conclusions of compliance audits, tests and monitoring activities, including related root cause analyses;

- Key remedial initiatives undertaken by the Company, including the development and execution of corrective actions plans; and

- Disclosures to regulators and enforcement agencies.

38. Upon information and belief, the Company maintained versions of the Audit and Compliance Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

**Duties Pursuant to the Company's Code of Conduct**

39. The Individual Defendants, as officers and/or directors of Centene, were also bound by the Company's Code of Conduct (the "Code")[4] which, according to the Code, sets out basic principles to guide all directors, officers, and employees of Centene, who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

40. Concerning the purpose of the Code, the Code states the following:

> The purpose of this Code of Conduct (Code) is to provide guidance on how to conduct business in alignment with Centene's Mission, Values, and Behaviors. We work diligently to earn and maintain the trust of our communities and to have a reputation for doing business the right way.
>
> This Code has been approved by our Board of Directors and is applicable to all directors, officers, and persons employed by Centene Corporation and its subsidiaries (collectively "Centene" or "the Company"), as well as our subcontractors, vendors, stakeholders, and other interested parties. Each of us is expected to follow the Code and comply with all applicable laws, regulations, policies, and contractual requirements.

41. Concerning the Company's Ethics & Compliance Programs, imposed by the Code, the Code states the following:

[4] Available at https://www.centene.com/content/dam/centenedotcom/documents/CenteneCodeOfConduct_508.pdf.

> Through our robust Ethics & Compliance Programs, Centene offers guidance and support to assist all employees in understanding and following the Code and in escalating and resolving any concerns. The Ethics & Compliance Department manages written standards and policies, facilitates risk and compliance training, maintains multiple lines for communication and reporting (including a 24/7, independently administered helpline), conducts internal compliance monitoring and auditing, supports remediation of non-compliance, and recommends disciplinary action where needed. Ethics & Compliance team members are ready and willing to assist with any question or issue that may arise.
>
> Centene's Enterprise Risk Management process ensures risks are systematically identified, assessed, and managed. Our directors, officers, employees, and other stakeholders play an important role in risk identification. By listening carefully, asking questions, and speaking up, employees shed light on potential risks and help define the opportunity to address them.
>
> The Chief Risk, Ethics & Compliance Officer oversees all Risk Management and Ethics & Compliance Programs and keeps the Audit & Compliance Committee of the Board of Directors and the full Board of Directors updated, as appropriate. This oversight ensures accountability at the highest level.

42. Concerning acting with honesty and integrity as well as books and records, the Code states the following:

> Through our work as a national leader in government-sponsored healthcare programs, our Company is vested with a public trust. We are required and expected to make responsible use of taxpayer dollars, accurately and transparently account for our work on our customers' behalf, and deliver on our commitments.
>
> To honor that trust, we must always act in accordance with the highest standard of honesty and integrity. At a minimum, this means ensuring our books and records are accurate and complete, recognizing and attending to potential conflicts of interest (including those related to giving and receiving business courtesies), and being vigilant in detecting, preventing, and correcting instances of non-compliance or fraud, waste, and abuse in our own practices as well as the practices of our providers and business partners.
>
> * * *
>
> Our Company operates in a highly regulated environment, and the records of our business practices, including our financial bookkeeping and accounting, claims-related activity, and member and provider interactions, must be accurate, complete, and clear. No matter your role with the Company, you must:

- Ensure any documents you create or modify represent an accurate, complete, and clear record of the facts.

- Exercise diligence in your reviews and avoid "rubber stamping" approvals. You are accountable for any document you review and approve, even if the document did not originate with you.

- Hold yourself and your team members to the highest standard of quality. It is not enough that the accuracy, completeness, and clarity of a record represents our "best effort." The record must be right.

- Comply with all applicable laws, regulations, contractual requirements, and policies regarding the content, format, and submission of Company records. Even an accurate record may place the Company at risk if the record fails to adhere to applicable technical specifications.

- Seek guidance if you have questions or are unsure what to do. The requirements, particularly with respect to financial reporting, can be complex. Your People Leader, Legal counsel and the Ethics & Compliance and Internal Audit Departments are available to assist you.

43. Concerning fraud, waste, and abuse, the Code says the following:

Centene protects our members and reduces the overall cost of healthcare by preventing, detecting, and correcting fraud, waste, and abuse (FWA). We have a comprehensive FWA program, led by Centene's Special Investigations Unit (SIU) and supported by Program Integrity functions throughout the Company. FWA can result from inappropriate employee practices, too, such as falsifying expense reports or misdirecting Company funds.

FWA is not only unethical, it is illegal. Actual or suspected FWA, other illegal misconduct, or violations of this Code must be reported promptly. In addition to notifying your People Leader, you should also report through one of the following channels:

- SIU at Special_Investigations_Unit@centene.com
- FWA Helpline at 1-866-685-8664 or www.centene.ethicspoint.com
- Ethics & Compliance Department at Compliance@centene.com

Each Centene employee is required to complete annual FWA training to understand the importance of our program and their own role in preventing, identifying, reporting, and correcting FWA.

44. Upon information and belief, the Company maintained versions of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

**Control, Access, and Authority**

45. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Centene, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Centene.

46. Because of their advisory, executive, managerial, and directorial positions with Centene, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Centene.

47. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Centene and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

48. To discharge their duties, the officers and directors of Centene were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Centene were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d) remain informed as to how Centene conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that Centene was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**BREACHES OF DUTIES**

49. Each Individual Defendant, by virtue of their position as a director and/or officer, owed to Centene and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Centene, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Centene, the absence of good faith on their part, and a reckless disregard for their duties to Centene and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Centene.

50. The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make

false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

51. In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Related Securities Action that alleges violations of the federal securities laws. As a result, Centene has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

52. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

53. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

54. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, unjust enrichment, gross mismanagement, and abuse of control; and (b) disguise and misrepresent the Company's actual business and financial prospects.

55. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or

negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

56. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

57. Centene, a Delaware corporation headquartered in St. Louis, Missouri, operates as a healthcare enterprise focused on providing healthcare to underinsured and uninsured families across the United States. The Company operates through four segments: (i) Medicaid, (ii) Medicare, (iii) Commercial, and (iv) Other.

58. The Company's Medicaid segment is comprised of a number of government-sponsored programs, such as: (i) the Temporary Assistance for Needy Families ("TANF") program, (ii) Medicaid Expansion initiatives, (iii) the Aged, Blind, or Disabled ("ABD") program, (iv) the Children's Health Insurance Program ("CHIP"), (v) Long-Term Services and Supports ("LTSS"), (vi) Foster Care, and (vii) Medicare Medicaid Plans ("MMP").

59. The Company's Medicare segment offers Medicare Advantage plans, Medicare Supplement insurance, Dual Eligible Special Needs Plans ("D-SNPs"), and Medicare Prescription Drug Plans ("PDPs"), also known as Medicare Part D.

60. The Company's Commercial segment deals with health insurance products provided through the private health insurance marketplace, including coverage options for individual customers, small employer groups, and large employer groups.

61. Lastly, the Company's Other segment covers Centene's pharmacy services, Envolve Benefit Options' dental and vision services, clinical healthcare and behavioral health services, participation in the TRICARE program, and various corporate management functions.

**Defendants' False and Misleading Statements and/or Omissions**

62. The Relevant Period began on December 12, 2024 when the Company issued a press release announcing its financial guidance for 2025 (the "December 2024 Press Release"). In the Company's December 2024 Press Release, Defendant London stated, in relevant part:

> Centene is a mission-driven organization, dedicated to delivering high quality outcomes for more than 28 million members, many of whom are among the nation's most medically complex and historically underserved populations. Over the last three years we improved our core operations and invested in the experience of our customers and providers, all while delivering on our financial commitments. This morning, we are reiterating our 2024 adjusted diluted EPS guidance of greater than $6.80. Additionally, we issued 2025 adjusted diluted EPS guidance of greater than $7.25, representing more than 6% year-over-year growth.

63. On that same day, the Company hosted an Analyst/Investor Day to provide details of the 2025 financial guidance (the "Analyst/Investor Day"). At the Analyst/Investor Day, Defendant Asher represented, in relevant part:

> Let's start with the basics. Stability in earnings power in the face of unprecedented headwinds provide Centene with a solid jump off point for 2025 and beyond. As you've likely seen by now, we've issued 2025 adjusted EPS guidance of greater than $7.25, representing more than 6% year-over-year growth compared to this year's current outlook. We are using today as an opportunity to set the floor for 2025 guidance, inclusive of an expectation for a 3% to 4% Medicaid composite rate adjustment.

* * *

> Now let's move to why you joined us today: the future. Starting with the first ingredient you need to drive earnings growth: revenue growth. ***We are expecting 7.6% growth at the midpoints, $11 billion of additional premium revenue compared to 2024 for a 2025 guidance midpoint of $155 billion of premium and service revenue***.[5]
>
> * * *
>
> What does all of this add up to? Initial 2025 adjusted diluted EPS guidance of greater than $7.25. You can see 2025 guidance elements summarized here, including our first year with a diluted share count starting with a 4. Note also an adjusted effective tax rate of 22% to 23%, which is down a little from 2024, primarily driven by a state tax benefit expected to be realized in Q4 of 2025.

64. On February 4, 2025, the Company issued a press release announcing its financial results for the fourth quarter and full year ended December 31, 2024 (the "4Q/FY24 Press Release"). The 4Q/FY24 Press Release contained the Company's 2025 financial guidance, which included, in relevant part:

> **Outlook**
>
> The Company is increasing its 2025 premium and service revenues guidance range by $4.0 billion to a range of $158.0 billion to $160.0 billion to reflect the following expectations:
>
> - outperformance in our PDP annual enrollment resulting in an additional $1.5 billion premium revenue,
> - outperformance in our Medicare Advantage annual enrollment resulting in $1.0 billion of additional premium revenue, and
> - $1.5 billion of additional Medicaid premium revenue due to a program change adding behavioral health coverage in one of our state contracts.
>
> The Company reiterates its 2025 GAAP diluted EPS guidance floor of greater than $6.19 and its 2025 adjusted diluted EPS guidance floor of greater than $7.25.

65. That same day, the Company hosted an earnings call with analysts and investors that further detailed the Company's increased 2025 guidance (the "4Q/FY24 Earnings Call").

---

[5] Emphasis added unless otherwise indicated.

66. During the 4Q/FY24 Earnings Call, Defendant London detailed the Company's increased 2025 guidance, stating, in pertinent part:

> Strong results that demonstrate the durability of our earnings power and position the company to execute against our strategic goals in 2025. ***Driven by better-than expected results during the Medicare annual enrollment period and a program expansion in Medicaid, we are lifting our full year 2025 revenue guidance by $4 billion.***
>
> Our outlook for full year 2025 adjusted diluted EPS remains unchanged at greater than $7.25, and we are pleased with the trajectory we are on at this early stage in the year. To that end, let's talk about the opportunities in each of our business lines and how we are positioned for 2025.

67. Also during the 4Q/FY24 Earnings Call, Defendant Asher reaffirmed the Company's decision to increase the 2025 guidance, stating, in relevant part:

> So we are increasing our consolidated 2025 premium and service revenue guidance range by $4 billion to a range of $158 billion to $160 billion of premium and service revenue. This is good news as you think about the long-term earnings power of Centene. At this very early point in the year, we are reiterating our 2025 adjusted diluted EPS guidance floor of greater than $7.25. Quick comment on 2026 Medicare rates. The preliminary percentage rate change for us is in the low to mid 3s, including the positive impact of STARS from the work we did in 2023 and 2024.

68. On April 25, 2025, Centene issued a press release announcing its financial results for the first quarter 2025 (the "1Q25 Press Release"). The 1Q25 Press Release also included an increased guidance for 2025. Defendant London stated, in relevant part:

> Our first quarter results demonstrate the resiliency of Centene's platform and the progress we are making as an organization while navigating a dynamic policy landscape. ***We are pleased to reiterate our full year 2025 adjusted diluted earnings per share outlook of greater than $7.25 and continue to see attractive opportunities to grow from the strength of our core businesses in the years to come.***

69. The 1Q25 Press Release also provided an updated guidance for fiscal year 2025 (the "2025 Fiscal Year"), stating, in pertinent part:

**Outlook**

The Company is increasing its 2025 premium and service revenues guidance range by $6.0 billion to a range of $164.0 billion to $166.0 billion to reflect the following expectations:

- $5.0 billion of additional Marketplace premium revenue due to outperformance in enrollment throughout the first quarter; and
- outperformance in the Medicare Advantage annual enrollment period resulting in $1.0 billion of additional premium revenue.

The Company reiterates its 2025 GAAP diluted EPS guidance floor of greater than $6.19 and its 2025 adjusted diluted EPS guidance floor of greater than $7.25.

The Company's annual guidance for 2025 is as follows and will be discussed further on our conference call:

| | Full Year 2025 |
|---|---|
| GAAP diluted EPS | > $6.19 |
| Adjusted diluted EPS (1) | >$7.25 |

1) A full reconciliation of adjusted diluted EPS is shown in the Non-GAAP Financial Presentation section of this release.

| | Full Year 2025 | |
|---|---|---|
| | Low | High |
| Total revenues (in billions) | $ 178.5 | $ 181.5 |
| Premium and service revenues (in billions) | $ 164.0 | $ 166.0 |
| HBR | 88.9 % | 89.5 % |
| SG&A expense ratio | 7.7 % | 8.2 % |
| Adjusted SG&A expense ratio (2) | 7.7 % | 8.2 % |
| Cost of services expense ratio | 88.2 % | 88.8 % |
| Effective tax rate | 21.5 % | 22.5 % |
| Adjusted effective tax rate (3) | 22.0 % | 23.0 % |
| Diluted shares outstanding (in millions) | 491.0 | 494.0 |

2) Represents a non-GAAP financial measure. Adjusted SG&A expense ratio excludes acquisition and divestiture related expenses of approximately $550 thousand.

3) Represents a non-GAAP financial measure. Adjusted effective tax rate excludes income tax effects of adjustments of approximately $165 million to $168 million.

70. That same day, the Company held an earnings call with analysts and investors to discuss its first quarter financial results for the 2025 Fiscal Year as well as the updated 2025 guidance (the "1Q25 Earnings Call").

71. During the 1Q25 Earnings Call, Defendant Asher represented, in relevant part:

> ***On our entire Medicaid book, we are projecting a full year composite rate increase at 4% plus.***
>
> ***Medicare Advantage and PDP both outperformed on membership. We retained more membership than expected during the Medicare Advantage open enrollment period, which bodes well for long-term earnings power. This is***

> ***contributing $1 billion to our 2025 premium and service revenue guidance increase. PDP ended the quarter at 7.9 million members, strong growth from 2024.***
>
> Medicare segment HBR was 86.3% in the quarter, which, as we covered in past discussions, is expected to follow an inverted slope line compared to 2024 due to the Inflation Reduction Act program changes. So a lower Medicare segment HBR and higher earnings early in the year and a higher HBR and lower earnings later in the year.
>
> Within the Medicare segment, both Medicare Advantage and PDP businesses were on track in the quarter. And you'll see an intra-year increase in the Medicare Advantage PDR, premium deficiency reserve, that was planned for and is solely related to the sloping of earnings during 2025. So no change in our view of Medicare Advantage earnings for 2025.
>
> Commercial membership was very strong in the quarter, not just during open enrollment for 1/1, but also in February and March. Q1 Commercial segment HBR at 75.0% was a little higher than last year's 73.3%, driven by 1.9 million new Marketplace Members in Q1. These members are utilizing a little more than last year's new members. But because it's so early in the year, we are not yet recognizing a matching offset for risk adjustment. We'll know more when we get the first Wakely file in late June, early July.
>
> ***Given top line performance in Q1, and even as we forecast net membership attrition throughout the rest of the year, we are adding $5 billion of premium revenue to 2025 guidance related to Marketplace.***
>
> * * *
>
> ***Looking at the full year, we are pleased to reiterate greater than $7.25 of adjusted diluted EPS. As you've heard, the theme of the quarter was strong premium revenue growth and stronger-than-expected membership. Accordingly, we are increasing premium and service revenue guidance to a midpoint of $165 billion, up from $159 billion.***

72. During the question-and-answer portion of the 1Q25 Earnings Call, both Defendants London and Asher took on questions from analysts. In relevant part, this segment of the 1Q25 Earnings Call proceeded as follows, in pertinent part:

> <Q: Ann Kathleen Hynes - Mizuho Securities USA LLC – Analyst> I know you gave original guidance from Medicaid rates in the second half. You assumed, I believe, around the 2.5% rate increase. Is that still the case? And do you have

increased visibility on how those negotiations are going for the second half? That would be my first question.

And then maybe secondly, with Medicaid besides the flu, is anything running harder than you expected when you -- versus when you gave original guidance?

<A: Defendant London> Thanks, Ann, for the question. So composite rate for the full year, we're now seeing at mid-4s, and the rate negotiations relative to upcoming, so think about the 7/1 cohort, which is the next cycle, we will start to get visibility into that as we get in -- later into Q2. So more to come on that front. But as you heard me say, I think we're seeing good continued momentum in our discussions with state partners. And the fact that as we roll forward, we have further completion data behind us in terms of the acuity patterns that started to emerge in Q2 right around this time last year. So that helps bolster the conversation in terms of supporting the actuarial calculus, and I think helps in conversations with the state. So obviously, looking to that 7/1, 9/1 and 10/1 cohort to contribute to the back half of the year.

And then I think you asked about Medicaid utilization beyond flu. And so we continue to see largely the same themes. But Drew, maybe you want to click into a few of those.

<A: Defendant Asher> Yes. No, clearly, we had the flow of $130 million in Q1. That's transitory. Behavioral health continues to be a trend item. We've mentioned that probably for the last 6 quarters. We've got initiatives to tackle that and working with our state partners, things like applied behavioral analysis. I guess, no surprise coming out of the pandemic era. There's pockets of home health. We've mentioned that before, things like attended services that where we can tighten UM, do some audits. And then probably the area of uptick is high-cost drugs. An example might be Elevidys, which curiously is a $3.2 million single-treatment drug that if you read the JAMA articles, it's questionable in terms of the efficacy. And looking at -- we're all trying to keep health care affordable. That seems quite extreme for a cost of a single treatment for a newly approved drug last year. So that's an area of uptick that effectively is on the back of the federal and state governments and us as a payer.

So that's one thing we're watching, and we thought about that as we lifted the Medicaid HBR into the mid- to high 90-ones from our previous guidance.

* * *

<Q: Hua Ha – Robert W. Baird & Co. – Analyst> Regarding the exchanges. So firstly, I'm having a little bit of trouble bridging to your expected $5 billion of additional revenue. If I take your roughly 0.5 million more lives, 550 revenue PMPM, I'm still getting to only about $3 billion to $4 billion. And I know you're

still assuming the same in your attrition cadence. So I was wondering if you could help me bridge that gap in case I'm missing something.

And then I understand you're treating incremental exchange growth in 1Q to be lower margins. It sounds like you could be conservatism, but wondering what exact margin level you're assuming on those lives. And lastly, very quickly, when you hear the most bearish concerns about the magnitude of potentially millions of fraudulent lives and the exchanges and the risk that might pose to you next year. I'm just curious to hear your general thoughts overall level of confidence that this most bear-case scenario that's rolling around won't actually happen.

<A: Defendants London> Yes. Thanks for the question. So let me start with the last piece of that and we can sort of work our way backwards. There's obviously been a lot of concern about the idea that there is sort of ramp in broker fraud or ghost members in the population, I think it's important to note that the movement to drive additional program integrity, which was understandably loosened during the pandemic, started more than a year ago and a lot of the program integrity measures that are being put in place are things that we've operated with in the past, which means we have baseline and benchmark data around what some of these rates should be.

We were a pioneer in terms of implementing the agent of record lock. Back in January of last year we introduced that. We were the first to put it in place. And we're seeing the benefit of that. And we track very closely the levels of complaints that come in from members or where there are broker issues throughout the year and can understand whether we're seeing upticks in that and anything different than what we would expect.

So I think we have accounted for things like the failure to reconcile in our full year outlook. Again, the timing of that has shifted. But the team is pretty experienced at understanding the dynamics in the membership. Obviously, the new utilizers that we have where we're seeing utilization is frankly a good sign because it's hard for ghosts to utilize the system. And we feel like we have all the data we need to account for what -- how this will play out both through the remainder of this year and in 2026.

I think you asked about sort of the level of margin for the new member cohort. Overall, we still expect to be in the 5% to 7.5% margin range for Marketplace. And as I said, we've encountered for a continuation of the level of utilization we're seeing in that new member base. In the full year outlook, our renewal members are as expected.

And then...

<A: Defendant Asher> Yes, then on your first question, the -- so we put up $10.1

> billion of commercial premium in Q1. And if you do the math on our guidance, it's $39 billion for the full year. So we are accounting for attrition throughout the rest of the year to end up in the high 4s. So that sort of hangs together.

73. The statements detailed above were materially false and misleading because they failed to disclose, *inter alia*, that: (i) the Company's public statements about its financial guidance for fiscal year 2025 and its operational stability were public representations about the Company's financial guidance and operational stability were based on faulty assumptions and unsupported projections; (ii) the Company misrepresented its enrollment and morbidity rates, especially with regard to its Medicare segment; and (iii) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

**The March 27, 2025 Proxy Statement**

74. On March 27, 2025, the Company filed the 2025 Proxy Statement with the SEC. Defendants London, Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, Robinson, Samuels, and Tanji solicited the 2025 Proxy Statement. The 2025 Proxy Statement solicited shareholders to vote regarding: (i) the election of eleven directors to hold office until the 2026 Annual Meeting of Stockholders or until their successors are duly elected and qualified; (ii) to cast a non-binding advisory vote on the compensation of the Company's Named Executive Officers; (iii) ratification of the appointment of KPMG LLP as the Company's independent registered accounting firm for the fiscal year ending December 31, 2025; (iv) to approve the Company's 2025 Stock Incentive Plan; and (v) stockholder proposals.

75. The 2025 Proxy Statement explains that the Incentive Plan would increase the aggregate number of shares authorized for issuance under the existing plan to 15,000,000 shares. As of March 15, 2025, there were 6,202,973 shares available to grant to employees. The 2025

Proxy Statement noted that if the Centene shareholders approved the Incentive Plan, "employees, officers, directors, consultants and advisors are eligible to receive awards under the Plan." The Incentive Plan would be administered by the Compensation and Talent Committee if approved. Further, the 2025 Proxy Statement notes that the Incentive Plan "grants [] restricted stock units, stock options, stock appreciation rights, restricted stock, and any other stock-based awards that have values based on the values of shares, including but not limited to grants of stock and grants of rights to receive stock in the future."

76. Regarding the Board's role in "Risk Oversight," the 2025 Proxy Statement stated the following, in relevant part:

> The Board has overall responsibility for the oversight of enterprise-wide risk management at Centene, while management is responsible for day-to-day risk management. The Board implements its risk oversight function both as a whole and through its committees. Each Board committee oversees risks associated with its respective principal areas of focus and then reports to the Board. These areas of focus include competitive, economic, operational, financial (including accounting, credit, liquidity and tax), legal, regulatory, compliance, political, strategic, reputational and other risks.
>
> The oversight responsibility of the Board and its committees is assisted by management reporting processes designed to provide visibility to the Board of the identification, assessment, prioritization and management of critical risks and management's risk mitigation strategies. The Company's process for the evaluation of risk is based on a blend of principles associated with the Committee of Sponsoring Organizations of the Treadway Commission (COSO) enterprise risk management framework, *Enterprise Risk Management – Integrating with Strategy and Performance and ISO 31000: 2018 Risk Management*. The primary goals of the enterprise risk management program are to enhance management's ability to identify and assess the Company's current risk status, gain insights on emerging risks, improve management's strategic and operational decision-making ability and provide clear and timely communication of cross-functional risks to management and the Board. The enterprise risk management process is facilitated by the Company's Risk Management department. An enterprise risk management committee comprised of senior leaders within the Company meets at least four times per year to discuss the most significant risks to the Company identified by the Company's enterprise risk management process and the steps management has taken to identify, monitor, assess and control or avoid such exposures. The enterprise risk management committee also reviews performance measures

> against the company's risk appetite and tolerance and provides recommendation(s) of corrective action, where appropriate. The enterprise risk management process is an active process and is continually enhanced and updated.
>
> The Company's Risk Management department provides an enterprise risk management report to the full Board at least four times per year. Each Board committee reports to the Board any significant issues relating to their relevant risk areas.

77. Regarding the Company’s Code of Conduct, the 2025 Proxy Statement provides:

> The Company has published on its website (www.centene.com) its Code of Conduct, which applies to all officers, employees and directors. Any waiver of, or amendments to, the Code of Conduct for directors or executive officers, including the chief executive officer, the chief financial officer and the principal accounting officer, must be approved by the Governance Committee, and any such waivers or amendments will be disclosed within four business days by the Company by posting such waivers or amendments to its website. Both the Audit and Compliance Committee and the Governance Committee review management's monitoring of compliance with the Company's Code of Conduct.

78. The 2025 Proxy Statement was false and misleading in its solicitation of shareholder support for the foregoing items because it contained material misrepresentations and/or failed to disclose information pertaining to the allegations contained herein, particularly that: (i) the Company’s public statements about its financial guidance for fiscal year 2025 and its operational stability were public representations about the Company’s financial guidance and operational stability were based on faulty assumptions and unsupported projections; (ii) the Company misrepresented its enrollment and morbidity rates, especially with regard to its Medicare segment; and (iii) the Company failed to maintain adequate internal controls.

79. Additionally, the 2025 Proxy Statement was false and misleading because it failed to disclose that the Company did not in fact maintain proper internal controls as it pertained to risk management. Due to this, the 2025 Proxy Statement was false and misleading.

**The Truth is Revealed**

80. The truth emerged on July 1, 2025, when the Company published a press release

withdrawing the Company's previously issued GAAP and adjusted diluted (EPS) guidance for the 2025 Fiscal Year.

81. The press release provided, in relevant part:

> **Marketplace 2025 Risk Adjustment Update**
>
> The Company recently received and analyzed its first view of 2025 industry Health Insurance Marketplace (Marketplace) data from Wakely, an independent actuarial firm, covering 22 of Centene's 29 Marketplace states, and representing approximately 72% of the Company's Marketplace membership. This data is submitted to Wakely by most Marketplace insurance carriers.
>
> Based upon the Company's preliminary interpretation of the data and discussions with Wakely, the overall market growth in the 22 states is lower than expected and the implied aggregate market morbidity in those states is significantly higher than, and materially inconsistent with, the Company's assumptions for risk adjustment revenue transfer used in the preparation of its previous 2025 consolidated guidance.
>
> ***The Company's preliminary analysis of the 22 states results in a reduction to its previous full year net risk adjustment revenue transfer expectation by a preliminary estimate of approximately $1.8 billion which corresponds to an adjusted diluted EPS impact of approximately $2.75. This preliminary estimate includes a projection of the remaining eight months of 2025 and is based on 2025 paid claims through April 30 from Wakely for the 22 states, as well as the Company's membership estimates and morbidity trend estimates for both its members and the aggregate market, calculated by state.***
>
> The Company does not have information or estimates for its remaining seven Marketplace states, but anticipates, due to the morbidity trends observed in the 22 states, an additional reduction to its net risk adjustment revenue transfer expectation with a corresponding adjusted diluted EPS impact.
>
> Regarding the 2026 Marketplace plan year, the Company has commenced the process of refiling 2026 Marketplace rates to reflect a higher projected baseline of Marketplace morbidity than previously expected. The Company currently expects to be able to take corrective pricing actions for 2026 in states representing a substantial majority of its Marketplace membership.

82. On this news, the price of the Company's stock fell $22.87 per share, or 40.4%, from a closing price of $56.65 per share on July 1, 2025, to close at $33.78 per share on July 2, 2025.

83. Following Centene's disclosure, several prominent analysts revised their price targets downward. Notably, on July 2, 2025, Barclays cut its target by approximately 31%, lowering it from $65 to $45 in a report entitled "*CNC Withdraws 2025 Guidance In Early Sign of ACA Marketplace Spiral.*"

84. In the aftermath of the Company's retractions, CFRA similarly reduced its price target from $48 to $37 and warned, in relevant part:

> We cut our 2025 EPS view to $4.55 from $7.30 and keep 2026's at $7.91. CNC withdrew its 2025 guidance after reviewing new actuarial data that covers ~72% of CNC's Marketplace membership across 22 states. Centene now expects overall market growth to be lower and implied aggregate market morbidity in these states is significantly higher than CNC's assumptions for risk adjustment revenue transfer used in its previous guidance. From these 22 states, CNC sees a disconnect of $1.8B, which corresponds to an adj. EPS impact of $2.75. We note CNC has a marketplace business in 29 states total, and anticipate the remaining seven states will show similar morbidity trends. This could reduce CNC's net risk adjustment revenue transfer expectations, and therefore EPS expectations, further.

85. Similarly, Guggenheim characterized Centene's developments as a "tough update," stating in relevant part:

> Centene withdrew its 2025 guidance following a material anticipated HIX risk adjustment revenue shortfall and higher Medicaid cost trend, although favorable MA/PDP performance and likely SG&A cuts partially offset. Our back-of-the envelope math suggests a $2.50-$3.00 EPS range for 2025 now (vs. previous guidance $7.25+), contemplating estimated negative impacts of ~$3.80 from HIX risk adjustment and ~ $1.50-$2.00 from Medicaid trend, perhaps offset by a favorable $1+ on MA/PDP upside and SG&A savings. For HIX, CNC noted an ability to potentially partially offset for the vast majority of its HIX book in 2026 via increased pricing, although rate request data we've analyzed so far suggests CNC had already requested mid-to-high teens rate growth for 2026 prior to yesterday's announcement. At issue, however, is how low CNC undershot its risk transfer position vs. competitors, and if this was simply a CNC mismodeling issue or if acuity is significantly higher across the rest of CNC's markets, which could have negative read-throughs to MOH, ELV, and CI in our coverage given relative HIX footprints. Nonetheless, combined with major market exits from competitors, and a lack of enhanced HIX subsidy extension already putting pressure on HIX risk pools, the announcement underpins even greater uncertainty around the HIX market for 2026. Additionally, continued cost trend pressures in Medicaid (already flagged by ELV) paint a difficult picture for near-term Medicaid earnings

> without absolute guarantees that actuarial sound rate catch-ups across states could be obtained in a timely manner. While better-than-expected performance in MA and PDP may provide some offsets, and CNC can look to reprice its HIX book in 2026, the updates leave us incrementally cloudy on the 2026 set-up. Despite a historically low valuation (~6.7x our current 2026E EPS), we are not surprised to see the stock trading down significantly (20%+) post-market on the updates. Maintain NEUTRAL rating.

**<u>DAMAGES TO THE COMPANY</u>**

86. Centene has been, and will continue to be, severely damaged and injured by the Defendants' misconduct. As a direct and proximate result of the Defendants' conduct, Centene has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

a. costs incurred in compensation and benefits paid to Defendants that violated federal securities laws;

b. substantial loss of market capital;

c. costs already incurred and to be incurred defending the pending securities fraud class action lawsuit; and

d. any fines or other liability resulting from the Company's violations of federal law.

87. In addition, Centene's business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired. The credibility and motives of management are now in serious doubt.

88. The wrongdoing complained of herein has irreparably damaged Centene's corporate image and goodwill. For at least the foreseeable future, Centene will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Centene's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

89. Plaintiff brings this action derivatively in the right and for the benefit of Centene to redress injuries suffered, and to be suffered, by Centene as a direct result of violations of federal securities laws by the Defendants. Centene is named as a Nominal Defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

90. The Board of Centene, at the time this action was commenced, consisted of Defendants London, Eppinger, Blume, Burdick, Coughlin, Dallas, Ford, Samuels, and Tanji a total of nine (9) individuals.

91. Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Centene Board would be futile, and therefore, excused. This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

92. Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

93. Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's

business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

**Demand is Futile as to Defendant London Because Her Principal Professional Occupation as the Company's CEO**

94. Defendant London has been with the Company as CEO since 2022. Defendant London is also a member of the Board. As the CEO of the Company, it is reasonable to infer that, due to the importance of the Company's financial condition, as well as the Company's enrollment and morbidity rates, Defendant London would have been aware of the fact that: (i) the Company's public statements about its financial guidance for fiscal year 2025 and its operational stability were public representations about the Company's financial guidance and operational stability were based on faulty assumptions and unsupported projections; (ii) the Company misrepresented its enrollment and morbidity rates, especially with regard to its Medicare segment; and (iii) the Company failed to maintain adequate internal controls. In her role as CEO of the Company for the fiscal year 2024, Defendant London received $20,602,148 in total compensation. The Company does not claim that Defendant London is an independent director, and because her primary source of income and employment is her position as CEO of Centene, and thus her professional reputation is inextricably bound to her role at Centene, Defendant London is incapable of acting independently and demand is futile upon her.

**Demand is Futile as to the Audit and Compliance Committee Defendants**

95. Demand is futile as to Defendants Blume, Coughlin, Dallas and Tanji (the "Audit Committee Defendants") as members of the Audit and Compliance Committee for their knowing failure to fulfill their responsibilities.

96. The Board of Directors adopted an Audit Committee Charter, setting forth the responsibilities of the Audit Committee. The duties of the Audit Committee are set forth herein, *supra*.

97. Upon information and belief, in their capacity as members of the Audit Committee, the Audit Committee Defendants were privy to specific information related to the Company's business, operations, and prospects, which would reasonably put them on notice that the statements set forth above in the Company's public filings were materially false and misleading when made.

98. The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information concerning the fact that: (i) the Company's public statements about its financial guidance for fiscal year 2025 and its operational stability were public representations about the Company's financial guidance and operational stability were based on faulty assumptions and unsupported projections; (ii) the Company misrepresented its enrollment and morbidity rates, especially with regard to its Medicare segment; and (iii) the Company failed to maintain adequate internal controls. By allowing documents to be filled with misleading information, the Audit Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested. Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

**Demand is Futile as to the Director Defendants**

99. Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Company's Board would be futile, and therefore, excused. This is because a majority of the Board faces a substantial likelihood of liability as a result of their

knowing toleration of the above described false and misleading statements and omissions of material adverse facts, which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

100. Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

101. Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

102. Accordingly, the Director Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartially consider a demand to sue themselves in the present action.

**COUNT I**

**<u>Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act</u>**

103. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

104. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of

such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].”

105. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain “any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading.” 17 C.F.R. § 240.14a-9.

106. Under the direction and watch of the Individual Defendants, the 2025 Proxy Statement failed to disclose that: (i) the Company’s public statements about its financial guidance for fiscal year 2025 and its operational stability were public representations about the Company’s financial guidance and operational stability were based on faulty assumptions and unsupported projections; (ii) the Company misrepresented its enrollment and morbidity rates, especially with regard to its Medicare segment; and (iii) the Company failed to maintain adequate internal controls.

107. The Individual Defendants knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, the re-election of the directors.

108. The Company was damaged as a result of the Individual Defendants’ material misrepresentations and omissions in the 2025 Proxy Statement.

109. Plaintiff on behalf of Centene has no adequate remedy at law.

**COUNT II**

**Against the Securities Action Defendants for
Contribution Under Section 10(b) of the Exchange Act,
Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act**

110. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

111. As a result of the conduct and events alleged above, Centene has been named as a defendant in the Related Securities Action brought on behalf of Centene shareholders in which it is a joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and Rule 10(b)-5 promulgated thereunder.

112. Federal law provides Centene with a cause of action against other alleged joint tortfeasors under Rule 10b-5. In particular, under the Supreme Court's decision in *Musick, Peeler & Garrett v. Employers Insurance of Wausau*, 508 U. S. 286, Centene has a federal law right of contribution against joint tortfeasors under Rule 10b-5. Section 21D(f) of the Securities and Exchange Act further sets forth specific provisions entitling Centene to contribution against all joint tortfeasors under Rule 10b-5, regardless of whether they have been named as defendants in the currently pending Related Securities Action and sets forth specific rules regarding the determination of claims for such contribution.

113. Accordingly, Plaintiff, on behalf of Centene, hereby claims contribution against the Securities Action Defendants, each of whom has been named in the currently pending Related Securities Action as a joint tortfeasor with Centene under Rule 10b-5, or if joined in such actions, would be liable for the same damages as Centene.

114. Centene claims no right to indemnification under the federal securities laws from

them in this count, but rather only claims contribution.

**Allegations Regarding the Securities Action Defendants**

115. Throughout the Relevant Period, the Securities Action Defendants caused the Company to issue false and misleading statements and/or omit material information in public statements and/or Company filings concerning the Company's business and financial prospects. These statements were materially misleading to persons who purchased Centene securities during the Relevant Period.

116. The plaintiffs in the Related Securities Action allege that they relied, directly or indirectly, upon these false statements and misleadingly omissive disclosures in purchasing Centene securities, and, as a result, suffered damages because value of their investments was distorted by the false and materially omissive statements, and they purchased such securities at such distorted prices.

117. The damages suffered by said investors were caused by reason of the fact that: (i) they were induced to purchase said securities by the false and misleading statements alleged herein, and (ii) the reveal of the true nature of the Company's business and prospects resulted in the decrease in price of its securities, causing the value of shareholders investments to drop.

118. The plaintiffs in the Related Securities Action were unaware of the false and misleading nature of said statements and omissive disclosures.

119. When the Securities Action Defendants signed off on or made the false statements and omissive disclosures detailed herein, they had actual knowledge that they were false and misleading. As alleged in detail herein, due to their positions as employees and/or directors of Centene, the Securities Action Defendants were privy to information regarding the Company's business and financial prospects and would have been aware that the statements made were in

fact false and misleading when made.

120. Accordingly, the Securities Action Defendants are liable for damages under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and, if Centene were to be held liable in the Related Securities Action, the Securities Action Defendants would be liable to it for contribution. Plaintiffs hereby derivatively claim such right of contribution on behalf of Centene.

**Allegations Regarding the Securities Action Defendants as Control Persons**

121. In acting as alleged above, the Securities Action Defendants were acting as authorized agents of Centene in their roles as directors and/or employees. Because of their positions of control and authority as senior officers and/or directors, the Securities Action Defendants were able to, and did, control the contents of the various reports, press releases and public filings disseminated by the Company throughout the Relevant Period, as alleged herein.

122. The Securities Action Defendants were "controlling persons" of Centene within the meaning of Section 20(a) of the Exchange Act, and, accordingly, the Securities Action Defendants could be held liable to the plaintiffs in the Related Securities Action. Were the Company to be held liable in said Related Securities Action, the Securities Action Defendants would be liable to it for contribution.

123. Plaintiff hereby derivatively claims such right of contribution on behalf of Centene.

**COUNT III**

**Against the Individual Defendants for Breaches of Fiduciary Duty**

124. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

125. The Individual Defendants owed and owe Centene fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Centene the highest obligation of good faith, loyalty, and due care.

126. The Individual Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to Centene shareholders materially misleading and inaccurate information through the Company's SEC filings throughout the Relevant Period. These actions could not have been a good faith exercise of prudent business judgment.

127. During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Centene to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to Centene and its shareholders. As a result, the Individual Defendants grossly mismanaged the Company.

128. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

129. Plaintiff, on behalf of Centene, has no adequate remedy at law.

**COUNT IV**

**<u>Against all the Individual Defendants for Unjust Enrichment</u>**

130. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

131. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Centene.

132. The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Centene.

133. Plaintiff, as a shareholder and representative of Centene, seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and breaches of fiduciary duty.

134. Plaintiff, on behalf of Centene, has no adequate remedy at law.

## COUNT V

**Against the Individual Defendants for Abuse of Control**

135. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

136. The Individual Defendants have taken advantage of their positions as officers and/or directors of the Company to the detriment of Centene and the investing public by causing the Company to issue materially misleading statements and/or omitting material information concerning the reporting of the Company's financials and lack of related internal control.

137. As such, the Individual Defendants have abused their positions of control with the Company and are legally responsible.

138. Thus, for the aforementioned reasons, the Individual Defendants are liable to the Company for their wrongdoing.

## COUNT VI

**Against the Individual Defendants for Gross Mismanagement**

139. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

140. The Individual Defendants owed a duty of oversight to the Company in which they were responsible to ensure that the Company maintained adequate reporting controls for all financial, accounting and disclosure released by the Company. Furthermore, the Defendants were responsible to oversee, manage and control the operations of the Company, including the manners and methods of reporting in which the acts complained herein occurred.

141. Through the wrongful acts complained of herein, the Individual Defendants refused or did not properly discharge their responsibilities to the Company and its shareholders in a prudent manner as prescribed by law as well as in the Company's corporate governance regulations.

142. By committing the misconduct alleged herein, the Individual Defendants breached their fiduciary duties of due care, diligence and candor in the management and administration of Centene's affairs and in the use and preservation of Centene's assets.

143. During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Centene to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to Centene, thus breaching their duties to the Company.

144. As a result, the Individual Defendants grossly mismanaged Centene and should be liable to the Company for the resulting damages.

## COUNT VII

**Against the Individual Defendants for Waste of Corporate Assets**

145. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

146. As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Related Securities Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

147. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

148. Plaintiff, on behalf of Centene, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A. Declaring that Plaintiff may maintain this action on behalf of Centene and that Plaintiff is an adequate representative of the Company;

B. Determining and awarding to Centene the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

C. Directing Centene and the Director Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Centene and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for

shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

(1) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

(2) a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

D. Determining and awarding to Centene exemplary damages in an amount necessary to punish Defendants and to make an example of Defendants to the community according to proof at trial;

E. Awarding Centene restitution from Defendants, and each of them;

F. Awarding Centene Contribution from Securities Action Defendants, and each of them;

G. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H. Granting such other and further equitable relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: January 30, 2026

**BIELLI & KLAUDER, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst (#4788)
1204 N. King Street
Wilmington, DE 19801
(302) 803-4600
rernst@bk-legal.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

Joshua M. Lifshitz
**LIFSHITZ LAW PLLC**
1190 Broadway
Hewlett, NY 11557
Telephone: (516) 493-9780
Facsimile: (516) 280-7376

*Attorneys for Plaintiff*